# WISCONSIN ELECTRIC POWER COMPANY,
Plaintiff-Respondent,

v.

# CALIFORNIA UNION INSURANCE COMPANY
and Southern American Insurance Company,
Defendants-Appellants.†

Court of Appeals

*No. 87–0725. Submitted on briefs October 6, 1987.—Decided
November 19, 1987.*

(Also reported in 419 N.W.2d 255.)

† Petition to review denied.

674

For the plaintiff-respondent the cause was submitted on the briefs of *Terrence C. Thom* and *Dorothy H. Dey* of *Prosser, Wiedabach & Quale, S.C.,* Milwaukee.

For the defendants-appellants the cause was submitted on the briefs of *Marie A. Darst* and *Gerald M. Linnihan* of *Jardine, Logan & O'Brien,* of St. Paul, MN.

Before Moser, P.J. Wedemeyer and Sullivan, JJ.

MOSER, P.J. This is an appeal from a summary judgment granted in favor of the Wisconsin Electric Power Company (WEPCo), and against the California Union Insurance Company and the Southern American Insurance Company (collectively, "Cal Union"). The issues raised in this case are whether the trial court erred in determining by summary judgment that the policies issued by Cal Union provided coverage to WEPCo for its loss and whether the trial court erred in granting summary judgment as to damages. We hold that the trial court correctly decided these issues and affirm.

## BACKGROUND AND FACTS

Although the facts of this case are complicated, they are not in dispute. In 1970, WEPCo installed a three-phase power supply to the dairy farm of Wallace and Joan Daggett (the Daggetts). Shortly after this new electrical source was installed, the Daggetts

began noticing unusual behavior on the part of their cows including nervousness, a decline in milk production, failure to breed, ill health and sometimes death. In 1981, the cause of these problems was determined to be stray voltage from the new three-phase power supply. In 1982, WEPCo altered the power system and the problems with the dairy cows ended.

In 1983, the Daggetts filed suit against WEPCo for the damages sustained by them as a result of the harm to their cows. At the conclusion of the trial, the jury found in favor of the Daggetts and awarded damages in excess of $1,000,000. Before the trial court entered judgment, the Daggetts and WEPCo agreed to a settlement whereby WEPCo would pay $1,035,220.58 over a period of years. All of WEPCo's insurance carriers, including Cal Union, approved this settlement.[1]

In February of 1985, WEPCo made a demand on all its insurance carriers for indemnification in the amount of $935,220.58 (the settlement amount less the $100,000 self-insured retention) plus legal expenses of $336,227.52. Representatives of all eight insurance carriers met to discuss the allocation of this loss. A compromise was worked out among them to allocate the loss on a pro-rata basis. Cal Union did not agree to this compromise because it felt that it was not liable under any policy issued to WEPCo. The other carriers paid the amount allocated to them by the compromise. However, this left $148,700, the amount allocated to Cal Union, unpaid.

Because Cal Union continued to refuse to pay WEPCo, WEPCo filed an action in the circuit court for

---

[1]Between 1972 and 1983, WEPCo was insured by eight different companies, including Cal Union.

Milwaukee county seeking damages. The trial court, upon reading the terms of the policies issued by Cal Union, granted WEPCo's motion for summary judgment on the issue of Cal Union's liability. It also granted summary judgment on the issue of damages, awarding WEPCo $148,700 plus interest and costs.[2] Cal Union appeals from this judgment.

### CAL UNION'S LIABILITY

■

The first issue raised by Cal Union is whether its insurance policies provided coverage to WEPCo for the damages sustained by the Daggetts. Since the facts concerning this issue are undisputed, the trial court correctly concluded that construction of the insurance policy was a question of law properly decided on motion for summary judgment.[3] However, we owe no deference to the trial court's resolution of this issue.[4]

We recently stated:

> Contracts of insurance are controlled by the same principles of law that are applicable to other contracts. A policy of insurance like any other contract is to be construed so as to give effect to the intention of the parties. In the case of an insurance contract, the words are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of an insured would have understood the words to mean. What-

---

[2]Cal Union does not take issue with the appropriateness of awarding interest and costs.

[3]*Kennedy v. Washington Nat'l Ins. Co.,* 136 Wis. 2d 425, 428, 401 N.W.2d 842, 844 (Ct. App. 1987).

[4]*Id.*

ever ambiguity exists in a contract of insurance is resolved in favor of the insured. This is a restatement of the general rule that ambiguous contracts are to be construed most strongly against the maker or drafter. Words or phrases in a contract are ambiguous when they are reasonably or fairly susceptible to more than one construction.[5]

The relevant language to be interpreted in this case is:

1. *COVERAGE*

The Company does hereby agree to indemnify each Assured declared hereunder for ultimate net loss in excess of the underlying limits hereinafter stated, subject to the limitations, conditions and other terms of this insurance, which the Assured may sustain by reason of the liability imposed upon them by Law; or assumed by them under contract or agreement:

. . . .

(f) Property Damage Liability

for damages because of injury to or destruction of tangible property, including the loss of use thereof, caused by an occurrence, and

. . . .

The word "occurrence" wherever it appears herein means an accident or a continuous or repeated exposure to conditions which results in personal injury or property damage neither expected nor intended by the Assured. All such exposure to substantially the same general conditions existing and/or emanating from one location or source shall be deemed one occurrence.

. . . .

---

[5]*Id.* at 428–29, 401 N.W.2d at 844.

### 5. *PERIOD OF INSURANCE, TERRITORY*
This insurance applies only to occurrences and or accidents which happen during the period of this insurance, anywhere in the world.

Cal Union argues that the occurrence giving rise to liability occurred in 1970 when WEPCo installed the faulty power supply system. Since Cal Union did not enter into any insurance contract with WEPCo until 1977, there was no occurrence which happened during the policy period. Therefore, Cal Union argues, it is not liable to indemnify WEPCo for the losses sustained by the Daggetts.

The trial court rejected this argument. In relying on the reasoning of *Keene Corp. v. Insurance Co. of North America,*[6] it held that "[t]he unreasonably dangerous condition rendering the product defective was an occurrence of a single uninterrupted continuous nature spanning 1973 through 1982 thus properly characterized as a continuing cause constituting an occurrence happening within the policy period."

In *Keene,* the plaintiff, Keene Corporation, sought a declaratory judgment of the liability of its insurance carriers. Specifically, Keene sought a declaration of which of its insurance carriers covered its product liability for asbestos-related diseases. Several of its carriers denied liability on the grounds that coverage was not triggered until the diseases manifested themselves. Another carrier argued that successive coverage was triggered by continued exposure. Thus, any carrier who insured Keene at any point that a plaintiff breathed asbestos would be liable.

---

[6]667 F.2d 1034 (D.C. Cir. 1981), *cert. denied,* 455 U.S. 1007 (1982).

In a well-reasoned opinion, the court adopted both of these arguments. Holding that the manifestation of the diseases was one trigger of coverage, the court stated: "A latent injury, unknown and unknowable to Keene at the time it purchased insurance, must, at least, be covered by an insurer on the risk at the time it manifests itself. Any other result would violate very reasonable expectations of Keene."[7]

The court then went on to hold that exposure, even before any harm manifests itself, also triggers coverage.[8] It interpreted "bodily injury" to mean any part of the single injurious process that asbestos-related diseases entail.[9]

The term "occurrence" as applied to the present case is ambiguous.[10] In the usual case, there is little dispute as to when an injury occurs when dealing with a common injury or accident. However, with this type of injury, there is considerable dispute as to when the injury is deemed to occur.[11] It is therefore our duty to determine what a reasonable person in the position of the insured would have understood the words to mean.

■

We agree with the reasoning of the *Keene* decision. Cal Union's policy states "[t]he word 'occurrence' ... means ... a continuous or repeated exposure to conditions which results in ... property damage neither expected nor intended by the Assured. All ... exposure to ... the same general conditions existing and/or emanating from one location or source shall be

---

[7]*Id.* at 1044.

[8]*Id.* at 1046.

[9]*Id.* at 1047.

[10]*See id.* at 1041; *see also Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1222 (6th Cir. 1980).

[11]*See Forty-Eight Insulations* at 1222.

deemed one occurrence." A perfectly reasonable interpretation of this language, and the interpretation advanced by WEPCo, is that as long as there is harmful exposure to dangerous conditions, the occurrence is continuing. As in *Keene,* while any part of the single injurious process continues, the occurrence continues. This interpretation best protects the expectations and understandings of the insured. We therefore hold that the "occurrence" triggering coverage of the insurance policies began with the installation of the power supply in 1970 and continued uninterrupted until the problem was resolved in 1982. Since the occurrence was, in the terms of the policy, "happening" during the period of Cal Union's insurance, Cal Union's liability under the policy was triggered.

This interpretation is consistent with Wisconsin insurance law. While the precise issue raised here has never been addressed by our appellate courts, we find guidance in other insurance cases. In *Welter v. Singer,*[12] we decided a case where a car struck a bicyclist, trapping him underneath the car. The driver of the car stopped, but then drove clear of the intersection dragging Welter beneath the car. In an attempt to find reverse gear, the driver moved the car ahead by a foot, again dragging Welter. Finally, Welter's friend got behind the wheel of the car and backed up about ten feet in an attempt to free Welter.

Welter sued, alleging four different causes of action corresponding to the four times that he was injured by movement of the car. Thus, Welter claimed, his underinsurance carrier was liable for four different accidents or occurrences. This court rejected the argument stating that "where a single, uninterrupted

[12]126 Wis. 2d 242, 376 N.W.2d 84 (Ct. App. 1985).

cause results in all of the injuries and damage, there is but one 'accident' or 'occurrence.' If the cause is interrupted or replaced by another cause, the chain of causation is broken and there has been more than one accident or occurrence."[13] This court held: "A common sense view of the facts discloses that any of appellant's injuries not inflicted by the first impact were the result of causes acting concurrently with and directly attributable to it. Hence, it was the predominant, active and *continuing* cause."[14]

The reasoning of *Welter* is equally applicable in this case. Much of the damage sustained by the Daggetts and paid for by WEPCo was not inflicted by the first impact of the installation of the faulty power supply. Nevertheless, the damage was the result of a cause directly attributable to it. The cause or occurrence was, therefore, active and continuing during the term of Cal Union's policies, and Cal Union is liable to indemnify WEPCo.

## DAMAGES

Having affirmed the trial court on the issue of liability, we now must decide if it correctly granted summary judgment on the issue of damages.

■

Summary judgment is governed by sec. 802.08, Stats. It is appropriate if the pleadings, deposition, admissions on file and affidavits, if any, show that there is no genuine issue as to any material fact and

---

[13]*Id.* at 250, 376 N.W.2d at 87.

[14]*Welter,* 126 Wis. 2d at 251, 376 N.W.2d at 87 (emphasis added).

that the moving party is entitled to judgment as a matter of law.[15]

> When a motion for summary judgment is made and supported as provided in this section, an adverse party may not rest upon the mere allegations or denials of the pleadings but *the adverse party's response, by affidavits or as otherwise provided in this section, must set forth specific facts showing that there is a genuine issue for trial.* If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against such party.[16]

In the present case, WEPCo filed an affidavit showing the damages it incurred in support of its motion for summary judgment. This affidavit, along with the pleadings, showed that WEPCo's damages as a result of Cal Union's failure to provide coverage were $148,700. In stating its claim and damages against Cal Union, WEPCo made a *prima facie* case for summary judgment.

> If the moving party has made a prima facie case for summary judgment, the court examines the affidavits submitted by the opposing party for evidentiary facts and other proof to determine whether a genuine issue exists as to any material fact, or reasonable conflicting inferences may be drawn from the undisputed facts, and therefore a trial is necessary.[17]

---

[15]Sec. 802.08(2), Stats.

[16]Sec. 802.08(3), Stats. (emphasis added).

[17]*Preloznik v. City of Madison*, 113 Wis. 2d 112, 116, 334 N.W.2d 580, 583 (Ct. App. 1983).

In this case, Cal Union made no proof, by affidavit or any other means, that these damages were incorrect. In fact, in their response to WEPCo's motion, Cal Union never addressed this issue at all.[18] Evidentiary matters in affidavits accompanying a motion for summary judgment are deemed uncontroverted when competing evidentiary facts are not set forth in counteraffidavits.[19]

Since Cal Union did not, in its response to WEPCo's motion, set forth any facts which would refute the damages alleged, there was no material fact in dispute. Summary judgment on the issue of damages was, therefore, appropriate.

*By the Court.*—Judgment affirmed.

---

[18]In oral argument on the motion for summary judgment, counsel for Cal Union stated, in an attempt to raise an issue of fact regarding damages, "[t]here's never been a payment for instance of $150,000 retention." We do not deem this bald assertion sufficient to raise an issue of fact in light of the proof of damages submitted by WEPCo.

[19]*Jones v. Sears Roebuck & Co.,* 80 Wis. 2d 321, 326, 259 N.W.2d 70, 72 (1977).