Linda THOMPSON, Plaintiff-Respondent,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, an Illinois corporation,
Defendant-Appellant.†

Supreme Court

*No. 90-0108. Argued January 24, 1991.—Decided May 1, 1991.*

(Also reported in 468 N.W.2d 432.)

† Motion for reconsideration denied.

For the defendant-appellant there were briefs (in the court of appeals) by *Claude J. Covelli* and *Boardman, Suhr, Curry & Field,* Madison and oral argument by *Mr. Covelli.*

For the plaintiff-respondent there was a brief (in the court of appeals) by *Joe Thrasher* and *Weisel, Thrasher, Doyle & Pelish,* Rice Lake and oral argument by *Joe Thrasher.*

DAY, J.   This case is before the court on certification from the court of appeals pursuant to sec. (rule) 809.61, Stats. 1987–88. State Farm Mutual Automobile Insurance Company (State Farm) appeals from a summary judgment entered by the circuit court of Barron county, the Honorable James C. Eaton, Judge, for damages in favor of Linda Thompson and against State Farm in the amount of $300,000 plus costs and disbursements.

This is an underinsured motorist case. The issue certified to us by the court of appeals was stated as: Does the accidental shooting of a passing motorist by a deer hunter seated on the bed of his pickup truck "arise out of" the "use" of the truck? The more complete statement of the issue is: Does the accidental shooting of a passing motorist by a *disabled* deer hunter sitting in the bed of his pickup truck *and possessing a permit under sec. 29.09, Stats. 1987–88*[1] *authorizing him to "shoot or hunt from a stationary vehicle,"* "arise out of" the "use" of the truck? (Emphasis added.) The circuit court found that the accident arose out of the use of the motor vehicle, and that the accident was a risk within the reasonable contemplation of the parties to the insurance contract. The court therefore ruled that underinsured motorist coverage exists. We conclude that the accident arose out of the use of the underinsured motor vehicle, and we affirm the judgment of the circuit court.

---

[1]Section 29.09, Stats. 1987–88, provides that a person with a temporary or a permanent physical disability may obtain a permit to shoot or hunt from a stationary vehicle.

Among other things the parties stipulated to the following facts:

1. On November 25, 1988 Lester E. Thompson died as a result of being struck by a bullet. On that date he was married to Linda Thompson, the plaintiff in this action. Lester and Linda Thompson have three minor children. Linda Thompson, as surviving spouse, is the appropriate plaintiff in this action.

2. On November 25, 1988 Lester E. Thompson had in effect three automobile insurance policies issued by State Farm Mutual Automobile Insurance Company, each on a vehicle owned by Lester E. Thompson. Each of these State Farm policies included underinsured motor vehicle coverage with limits of liability of $100,000 per person and $300,000 per accident.

3. Each of the three State Farm policies identified in paragraph 2 contains the following language:

We will pay damages for BODILY INJURY an INSURED is legally entitled to collect from the owner or driver of an UNDERINSURED MOTOR VEHICLE. The BODILY INJURY must be caused by accident arising out of the operation, maintenance or use of an UNDERINSURED MOTOR VEHICLE.

UNDERINSURED MOTOR VEHICLE—means a land motor vehicle:

1. the ownership, maintenance or use of which is insured or bonded for bodily injury liability at the time of the accident; and

2. whose limits of liability for bodily injury liability:

a. are less than the amount of the INSURED'S DAMAGES; or

b. have been reduced by payments to PERSONS other than the INSURED to less than the amount of the INSURED'S DAMAGES.

4. The plaintiff, Linda Thompson, is an "insured" as that word is used in the policy language in paragraph 3.

5. The pickup truck owned by Mr. Yndestad is an "underinsured motor vehicle" as that term is used in the policy language contained in paragraph 3.

6. The plaintiff, Linda Thompson, is legally entitled to collect damages from Mr. Yndestad for the death of Lester E. Thompson. These damages are for "bodily injury" as that term is used in the policy language contained in paragraph 3.

7. The "bodily injury" was caused by the "accident" as that term is used in the policy language contained in paragraph 3.

8. This "bodily injury" did not arise out of the "operation" or "maintenance" of an underinsured motor vehicle as those terms are used in the policy language contained in paragraph 3.

9. On November 25, 1988, Mr. Yndestad was using a Remington Model 700 7MM Magnum bolt action rifle while deer hunting. He was handicapped and had a permit pursuant to sec. 29.09 Wis. Stats. to shoot or hunt from a stationary vehicle.

10. On November 25, 1988, Mr. Yndestad was the owner of a brown Dodge pickup truck. This truck was insured for bodily liability arising from the ownership, maintenance or use of the truck.

11. On November 25, 1988, Mr. Yndestad drove the pickup truck off the roadway to a point near a wooded area in an open field. He parked next to a stacked pile of wood and stumps. He turned off the

engine, left the cab and sat on the floor of the bed of the pickup truck.

12. After Mr. Yndestad had been sitting on the bed of the truck for a period of time, two deer came from the south across the open field in front of him. The deer were heading in a northerly direction toward the wooded area of the field to the west of Mr. Yndestad. He intentionally fired two shots at the deer with his rifle. He intended to hit one of the deer with each shot fired.

13. When Mr. Yndestad shot at the deer, he did so in the direction of Highway 48, which he could see from where he was sitting. He did not see any traffic on Highway 48 when he fired the shots. One of the shots missed the deer and traveled some 500 yards, passed [sic] the deer, to Highway 48 and struck Lester E. Thompson.

14. Mr. Yndestad was negligent for shooting his rifle in the direction of Highway 48 such that a bullet fired would cross the highway. This negligence was a cause of the bodily injury of Lester E. Thompson.

15. If this accident arises out of the use of an underinsured motor vehicle, as those words are used in State Farm's car policies, the plaintiff, Linda Thompson, is entitled to payment of the policy limits of the three policies for a total sum of $300,000.

16. The sole issue for resolution is whether the bodily injury to Lester E. Thompson was caused by an accident "arising out of the . . . use of an underinsured motor vehicle."

Since neither party claims that the terms of the insurance contract are ambiguous, and the facts are stipulated, we review the issue as a question of law. "Application of the terms of an insurance policy to established

facts is a question of law." *Blackhawk Prod. v. Chicago Ins.*, 144 Wis. 2d 68, 77, 423 N.W.2d 521 (1989). *See also Garriguenc v. Love,* 67 Wis. 2d 130, 133, 226 N.W.2d 414 (1975); *Elec. Power v. California Union Ins.,* 142 Wis. 2d 673, 677, 419 N.W.2d 255 (Ct. App. 1987). This court may decide questions of law independently, without deference to the trial court's decision. *Lambert v. Wrensch,* 135 Wis. 2d 105, 115, 399 N.W.2d 369 (1987).

This court has previously interpreted the "arising out of . . . use" language in an automobile liability policy. *See, e.g., Lawver v. Boling,* 71 Wis. 2d 408, 238 N.W.2d 514 (1976); *Tomlin v. State Farm Mut. Auto. Ins. Co.,* 95 Wis. 2d 215, 290 N.W.2d 285 (1980); *Allstate Ins. Co. v. Truck Ins. Exchange,* 63 Wis. 2d 148, 216 N.W.2d 205 (1974). While we rely on these interpretations, as did defendant State Farm, we reach a different result from that urged by State Farm.

In *Lawver,* Lawver sustained injuries when he fell from a platform rigged to a truck by a rope and pulley. 71 Wis. 2d at 411. The rope was tied to Boling's truck, and passed through an opening in a barn, through the pulley, where it was attached to the platform supporting Lawver. *Id.* Boling, the insured, had been moving his truck forward and backward when the rope snapped and Lawver fell. *Id.* Boling's insurance company agreed to pay damages for bodily injury "arising out of the . . . use" of the truck. *Id.* at 412. In Lawver's action against Boling, Boling's insurer moved for summary judgment on the grounds that there was no coverage. *Id.* at 410. The circuit court denied that motion and this court affirmed. *Id.* at 423. In interpreting the insurance policy, this court stated:

> As used in a liability insurance policy, the words "arising out of" are very broad, general and comprehensive. They are commonly understood to mean

456

> originating from, growing out of, or flowing from, and require only that there be some causal relationship between the injury and the risk for which coverage is provided . . ..
>
> The causal connection required to be established between the use of the automobile and the injuries is not of the type which would ordinarily be necessary to warrant a finding of "proximate cause" or "substantial factor" as those terms are used in imposing liability for negligent conduct.
>
> As it is used in the coverage clause of an automobile liability policy, the phrase "arising out of" is not so much concerned with causation as it is with defining the risk for which coverage will be afforded. The issue is whether the vehicle's connection with the activities which gave rise to the injuries is sufficient to bring those general activities, and the negligence connected therewith, within the risk for which the parties to the contract reasonably contemplated there would be coverage. This question is usually resolved by determining whether the alleged "use" is one which is reasonably consistent with the inherent nature of the vehicle.

*Id.* at 415–416.

In *Tomlin,* the court stated that "use," as that term is used in an automobile liability policy, "does not include a use which is completely foreign to a vehicle's inherent purpose." 95 Wis. 2d at 225. The court held that the driver's act of stabbing an officer while the officer was removing beer cans from the automobile was not the type of "use" of the automobile reasonably contemplated by the parties and was not consistent with the inherent use of the automobile. *Id.*

State Farm argues that like the driver in *Tomlin,* Mr. Yndestad did not "use" his truck in the accident. It

claims that his only connection with the truck, that he was sitting on it, does not mean that he used the truck to fire the shot. State Farm goes on to argue that even if Mr. Yndestad did use his truck to fire the shot, there is no causal connection between the use and the accident. The fact that he sat on the bed of the truck was not a cause of the accident.

We disagree. First, an insured does not necessarily have to "use" the vehicle in the sense of moving it forward, backing it up, putting it in gear, etc. for coverage under the "use" language.[2] As this court held in *Allstate,* even the loading and unloading of hunting equipment is a normal incident to use of a vehicle for hunting, and therefore constitutes "use" of the vehicle. 63 Wis. 2d at 158. This does not mean that the accident had to occur during loading or unloading for coverage under the "use" language either. For coverage, the "use" must be reasonably consistent with the inherent "use" of the automobile. *Lawver,* 71 Wis. 2d at 416; *Tomlin,* 95 Wis. 2d at 225; *Allstate,* 63 Wis. 2d at 158. For example, in *Tasker v. Larson,* 149 Wis. 2d 756, 761, 439 N.W.2d 159 (Ct. App. 1989), the court held that "[l]eaving one's child in a motor vehicle during a brief errand, ostensibly for safety as well as convenience, is reasonably consistent with the inherent nature of the vehicle."

In the case before the court, there must be a sufficient connection between Mr. Yndestad's truck and hunting from the bed of the truck so that the accident is within the risk for which State Farm and Mr. Yndestad reasonably contemplated there would be coverage. *See Lawver,* 71 Wis. 2d at 416. That is, Mr. Yndestad's "use"

---

[2]The type of "use" State Farm refers to would most likely fall under "operation" language of the insurance clause.

of the bed of the truck to hunt must be reasonably consistent with the inherent nature of the truck. *Id.* We hold that the use of the bed of the truck to hunt is consistent with the inherent nature of the truck. The use of the truck for a hunting trip is reasonably consistent with the inherent use of the truck. *See Allstate,* 63 Wis. 2d at 158. If it can be reasonably expected that this truck will be used to go on a hunting outing, the use of the bed of a truck, providing a flat elevated surface from which to hunt, constitutes a "use" of the truck consistent with this inherent nature of the truck as a hunting vehicle.

This is the very "use" of a motor vehicle contemplated by the legislative enactment i.e. that a disabled person driving or riding in such a vehicle would not have to leave the vehicle to hunt but could stay in it or on it. This is obviously for the convenience of the disabled hunter and a statutorily created use that without such provision would be a prohibited practice.[3]

State Farm's argument that the accident is not a type of risk for which coverage is provided, as contemplated by the parties to the insurance contract, is in error. The fact that the negligent act which resulted in Lester Thompson's death may not have been foreseen or expected is not determinative. *See Allstate,* 63 Wis. 2d at 160. Furthermore, although State Farm did not mention this fact nor address it in its brief, Mr. Yndestad's "use" of the truck to hunt has been approved by the legislature.

---

[3]*See* sec. 167.31(2)(c), Stats. 1987–88 which provides:

**Safe use and transportation of firearms and bows . . ..**
**(2)** PROHIBITIONS, MOTORBOATS AND VEHICLES; HIGHWAYS AND ROADWAYS . . .. (c) Except as provided in sub. (4), no person may load or discharge a firearm or shoot a bolt or an arrow from a bow or crossbow in or from a vehicle.

Section 29.09, Stats. is one of the exceptions.

As the circuit court noted, insurance carriers, just like the rest of the citizenry, are deemed to be placed on notice of the laws of this state.

State Farm also misinterprets the "causal connection" required for coverage under the policy. It relies on *Saunders v. National Dairy Products Corp.,* 39 Wis. 2d 575, 583, 159 N.W.2d 603 (1968) where the court held that "where there is no causal connection between the use and the acts causing liability, there is no coverage under the 'use' clause." In *Saunders,* Saunders was operating a tractor-trailer unit owned by his employer, L.C.L. *Id.* at 580. He backed the unit up to Kraft's loading dock in order to take on a load of cheese. *Id.* Saunders then got out of the tractor to ascertain whether the vehicle was in the proper loading position. *Id.* About eight or ten feet from the rear of the trailer, he slipped on a patch of ice which was hidden from view by fresh snow. *Id.* In determining whether L.C.L.'s policy extended coverage to Kraft for liability for " 'the use in its business of any motor vehicle or trailer owned and/or operated by or for the account of the assured,' " the court held that "the presence of the tractor-trailer unit in no way contributed to the presence of the ice which caused plaintiff's injury. At the most, the insured vehicle merely provided him with the means to transport himself to Kraft's premises, where independent forces caused him to slip and fall." *Id.* at 582–583.

In *Saunders* the tractor-trailer merely transported Saunders to the place where the accident occurred. As stated in *Snouffer v. Williams,* 106 Wis. 2d 225, 228, 316 N.W.2d 141 (Ct. App. 1982), "[s]uch antecedent 'use' of the automobile is distinct from the harm which thereafter arises from the condition created by the use of the automobile and . . . is not covered." (citing 12 *Couch on Insurance* 2d sec. 45.57 (rev. ed. 1981)). Nor is it enough

that the automobile be the physical situs of the injury or that the injury occur incidentally to the use of the automobile. *Id.* at 229.

Unlike *Saunders,* cited by State Farm, Mr. Yndestad's truck was not merely the means of transport to the place where he wished to hunt, it was also the means by which this disabled person did his hunting from the bed of the truck as he was specifically authorized to do by state law. To make *Saunders* precedential, Mr. Yndestad would have to have been on the ground outside and separate from the truck. The facts here are completely different than in *Saunders.*

In *Snouffer,* Richard Snouffer, Jr. and two friends were riding in a truck driven by Richard's brother, Steven. *Id.* at 226. Steven stopped the truck, and the two friends got out and knocked over Williams' mailbox. *Id.* at 227. Williams emerged from his house, and just as the two friends were getting back into the truck, he fired a pistol at the truck, striking Richard. The company which insured the truck provided that coverage would exist for bodily injury caused by an accident if the accident arose out of the use of the vehicle. *Id.* at 227. The court denied coverage, concluding that "Steven used the insured vehicle only to transport Richard to Williams' house. Once at Williams' house, the acts of the two friends and Williams, which were wholly independent of the use of the vehicle, resulted in Richard's injuries. *Id.* at 229.

Both *Saunders* and *Snouffer* are distinguishable from the case before us. In our case, Mr. Yndestad's truck was more than the vehicle which transported him to the place where the accident occurred. It was also more than the mere situs of the accident. Mr. Yndestad was sitting in the bed of the truck, aiming his rifle, and actually legally *hunting from his truck* when the acci-

461

dent occurred. As a disabled hunter, he had acquired a permit to do so. While the fact "that the activities could possibly have been carried on, and the accident taken place, without the use of the vehicle is irrelevant," *Lawver,* 71 Wis. 2d at 416, the fact that the activities in this case did take place using the vehicle is relevant.

As previously stated, in interpreting coverage of "arising out of the . . . use" clause, there must exist a causal connection between the injury and the risk for which coverage is provided. *Lawver,* 71 Wis. 2d at 416. The injury must also have a causal connection to the inherent use of the vehicle. *Tomlin,* 95 Wis. 2d at 225. In the case before us, this does not mean that the truck must have "caused" Lester Thompson's death. For example, in *Allstate,* the hunting van did not "cause" the van driver's death. The accidental discharge of a rifle, when it was removed from the van, was the "cause" of the shooting and death of the van driver. 63 Wis. 2d at 155. In *Tasker,* the truck the child was left in while the driver was on an errand certainly did not "cause" the child's death. To the contrary, the child was either nudged or stepped out of the truck onto the highway where he was struck by an oncoming vehicle. 149 Wis. 2d at 758.

Similarly, in the case before the court, Mr. Yndestad's truck certainly did not "cause" Lester Thompson's death.[4] As the parties stipulated, Mr. Yndestad's negligence in shooting his rifle in the direction of the highway on which Lester Thompson was driving was a "cause" of Lester Thompson's death. But the connection between Mr. Yndestad's "use" of the bed

---

[4]Or as the circuit court stated: "Mr. Thrasher's argument is Judge, don't waste your time considering that a truck can spit out a bullet." (Transcript of Proceedings, p. 45.)

of his truck to shoot, and his negligence in shooting his rifle, the accident which "caused" Lester Thompson's death, is a sufficient "causal connection" for coverage under the terms of the policy.

State Farm cites *Hutchins v. Mills,* 363 So. 2d 818 (Fla. App. 1978), as a similar case where the court did not allow automobile liability coverage. The issue in that case concerned the interpretation of "arising out of the . . . use" language, and it also concerned an accident which took place when a hunter was shooting from the bed of his pickup truck. *Id.* at 819. While we agree that *Hutchins* is factually similar to the case before us, we disagree with the conclusion in that case.

In applying the well-established principles of Wisconsin case law to the interpretation of State Farm's insurance policy, we conclude that the accident which resulted in Lester Thompson's "bodily injury" was caused by an accident "arising out of the . . . use" of Mr. Yndestad's underinsured motor vehicle. We therefore affirm the judgment of the circuit court in favor of Linda Thompson.

*By the Court.*—The judgment of the circuit court is affirmed.

STEINMETZ, J. (dissenting). The majority concludes that the injury in this case was covered under the underinsured motorist clause of Mr. Thompson's insurance policy. While I regard the majority's analytical framework as acceptable, I consider its conclusion erroneous. Specifically, the injury was not "*caused* by an accident *arising out of* the operation, maintenance or *use* of an *UNDERINSURED MOTOR VEHICLE*" as was required for coverage. (Emphasis added.) I would therefore not affirm the judgment of the circuit court.

463

It is clear that Mr. Yndestad was negligent for shooting his hunting rifle in the direction of a public highway. It is also clear that this negligence was a cause of bodily injury to Thompson. As Thompson's spouse, the plaintiff is thus legally entitled to collect damages from Mr. Yndestad for her husband's wrongful death resulting from that bodily injury. The issue for purposes of this case is whether she also is entitled to proceeds under her husband's insurance contract with the defendant. To answer this question, the court must look to the contract itself.

Words used in an insurance policy should be given their common everyday meaning and should be interpreted as a reasonable person in the insured's position would have interpreted them. *Paape v. Northern Assur. Co.,* 142 Wis. 2d 45, 51, 416 N.W.2d 665 (Ct. App. 1987), citing *Garriguenc v. Love,* 67 Wis. 2d 130, 134–35, 226 N.W.2d 414 (1975). In other words, the reasonable expectation of the parties to the contract at the time the contract was formed is controlling. If those parties did not contemplate a particular risk when they entered into the contract, any injury resulting from that risk is not covered.

The accident that occurred in the case at bar arose out of the use of a hunting rifle. A reasonable person would not consider accidents "arising out of the . . . use of an UNDERINSURED MOTOR VEHICLE," to include accidents arising out of the use of a hunting rifle. No reasonable person would contemplate such a risk in agreeing to the motor vehicle insurance contract at issue here. The language of the contract, given its common, everyday meaning, indicates that the parties could not reasonably have contemplated the coverage claimed by the plaintiff. It follows that the plaintiff should not be awarded the insurance proceeds she seeks.

This correct conclusion can be reached via various avenues of analysis. For example, this court has said with regard to the term "arising out of the use of a motor vehicle" that the accident "producing the injury must have some causal relationship to the inherent use of the vehicle" in order for there to be coverage. *Tomlin v. State Farm Mut. Auto. Ins. Co.,* 95 Wis. 2d 215, 225, 290 N.W.2d 285 (1980). In this case, the injury has no causal relationship to the inherent use of the vehicle.

In the first place, this is clear from the fact that the term "inherent use" for our purposes includes only those uses which are "reasonably consistent with the inherent nature of the vehicle." *Lawver v. Boling,* 71 Wis. 2d 408, 416, 238 N.W.2d 514 (1976). " 'Use' as contemplated by an automobile liability policy means the use of a vehicle as such and does not include a use which is completely foreign to a vehicle's inherent purpose." *Tomlin,* 95 Wis. 2d at 224–25. Unlike the situation in *Tasker v. Larson,* 149 Wis. 2d 756, 761, 439 N.W.2d 159 (Ct. App. 1989), relied upon by the majority, Yndestad was not "using" his vehicle by temporarily leaving a young child in its passenger compartment while conducting a "brief errand" away from the vehicle, which use was consistent with the inherent nature of the vehicle, and not foreign to its purpose. Indisputably, Yndestad was not even using the passenger compartment, the only part of a vehicle where a person's presence might raise a presumption of "use." He was using only the truck bed, and he was not using it as a vehicle but rather as a hunting perch. *See National Farmers Union Property and Casualty Co. v. Gibbons,* 338 F. Supp. 430, 434 (D.N.D. 1972) (automobile roof was used as a gun rest and not as a vehicle). This was a use of the vehicle inconsistent with its inherent nature and foreign to its purpose.

To whatever extent the legislative enactments upon which the majority relies are relevant as to the matter of a vehicle's inherent use, those enactments support my view that Yndestad's firing his rifle while in the truck bed did not constitute an inherent use of the vehicle. That is, the very fact that the legislature has said, pursuant to sec. 167.31(2)(c), Stats., that "no person may load or discharge a firearm or shoot a bolt or an arrow from a bow or crossbow in or from a vehicle" indicates that the legislature considers shooting from a vehicle *not* to be included within the inherent use of the vehicle. While the majority is correct that sec. 167.31(2)(c) also indicates that sec. 167.31(4)(c) provides an exception to this rule for handicapped individuals who hold a hunting permit under sec. 29.09(9)(c) as did Yndestad, this is a case of the exception proving the rule.

Specifically, the exception provides that the vehicle must be "standing" and "stationary." *See* secs. 167.31(4)(c) and 29.09(9)(a)2, Stats. While not conclusive evidence, these restrictions provide some indication that the legislature did not consider the exception to create any new or broader inherent nature of the vehicle. Rather, they indicate that the legislature considered the exception to allow merely a strictly proscribed incidental use of a vehicle which incidental use normally is altogether prohibited. Stronger evidence of this can be garnered by reference to certain other "exceptions" provided in sec. 167.31(4).

For instance, sub. (d) of that section indicates that no person is prohibited "from leaning an unloaded firearm against a vehicle." *See* sec. 167.31(4)(d). If the majority opinion is to be logically followed, the legislative enactment means that one who leans an unloaded firearm against a vehicle "uses" the vehicle for purposes of insurance coverage. Clearly, leaning an unloaded fire-

arm against a vehicle does not constitute "use" of a vehicle. Nor is there a "use" of a vehicle solely because an individual hunts from the bed of a truck. "Using" a vehicle as a hunting perch is completely foreign to a vehicle's inherent purpose. Such an activity constitutes only an incidental use of the vehicle, which the insurance policy does not cover. Would Ynestad's resting the rifle on an outside rearview mirror be an activity arising out of the use of the vehicle? I would hold "no," but it is in doubt what the majority would hold.

In addition, there was no causal relationship to any inherent use of the vehicle as required under *Tomlin.* Unlike the situation in *Allstate Ins. Co. v. Truck Ins. Exchange,* 63 Wis. 2d 148, 216 N.W.2d 205 (1974), relied upon by the majority, nobody in the case at bar was "actively engaged in loading or unloading the automobile" when the negligent act occurred, and, contrary to the express language of this court, the negligent act was not "a part of the loading or unloading activity." *Tomlin,* 95 Wis. 2d at 223–24, citing *Allstate* at 155. Moreover, unlike the situation in *Lawver,* majority op. at 456–457, there was no integral chain of events involving the vehicle that led to the accident. *See Smedley v. Milwaukee Automobile Ins. Co.,* 12 Wis. 2d 460, 107 N.W.2d 625 (1961); *Norton v. Huisman,* 17 Wis. 2d 296, 116 N.W.2d 169 (1962); *Neumann v. Wisconsin Natural Gas Co.,* 27 Wis. 2d 410, 134 N.W.2d 474 (1965); *Schmidt v. Luchterhand,* 62 Wis. 2d 125, 214 N.W.2d 393 (1974).

The situation in the case at bar is most analogous to what occurred in *Saunders v. National Dairy Products Corp.,* 39 Wis. 2d 575, 159 N.W.2d 603 (1968). In *Saunders,* the plaintiff truck driver slipped and fell on some ice on the loading dock where he parked to unload his truck. This court effectively determined that there was

no causal connection upon which to base automobile insurance coverage, reasoning that:

> At the most, the insured vehicle merely provided [the truck driver] with the means to transport himself to [the] premises, where independent factors cause him to slip and fall . . .. [W]here there is no causal connection between the use and the acts causing liability, there is no coverage under the 'use' clause.

*Id.* at 582–83. As the court of appeals said in *Snouffer v. Williams,* 106 Wis. 2d 225, 229, 316 N.W.2d 141 (Ct. App. 1982), in which insurance coverage was precluded where the injury resulted from a shot intentionally fired into the vehicle, " 'it is not enough that an automobile be the physical situs of an injury or that the injury occur incidentally to the use of an automobile.' " " '[T]he mere fact that the use of the vehicle preceded the harm . . . is not sufficient to bring such harm within the coverage of the policy.' " *Id.* at 228.

Similar to *Saunders* and *Snouffer,* the "use" of the vehicle here, although it was an essential feature of the circumstances leading up to the accident, was not responsible for the activity actually causing the accident. Ynestad's use of the hunting rifle from the bed of his stationary truck took place after Ynestad already had completed the transportation and unloading activities associated with the start of his hunt, and it constituted an independent cause of the accident. *See also, Hutchins v. Mills,* 363 So. 2d 818, 821 (Fla. App. 1978) (no causal connection where hunter, in bed of parked truck, accidentally shot another hunter).

As a practical matter, the impact of the majority decision will be to create a lack of certainty in the marketplace as well as elsewhere[1] as to what constitutes

---

[1]The trial court itself in this case admitted having great

"use" of a vehicle for purposes of insurance coverage.[2] This uncertainty, in turn, will without a doubt lead to higher insurance premiums for all Wisconsin motorists. *See generally,* R. Berger, *The Impact of Tort Law Development on Insurance: The Availability/Affordability Crisis and Its Potential Solutions,* 37 Am. U.L. Rev. 285 (1988) (society's insurance mechanisms, in order to effectively function as such, need to be based upon predictable risks, and where risks are not predictable, problems of availability and affordability of insurance

difficulty understanding under *Tasker,* which case the majority here purports to follow as to what does and what does not constitute an accident "arising out of . . . use" of a motor vehicle. The trial court indicated that, at present, the test as to whether a particular vehicle use is a "use" covered by insurance is "utterly subjective." Undoubtedly, other courts attempting to follow the majority here will have difficulty understanding what constitutes "use."

[2]For example, the majority opinion logically implies that leaning a firearm against a vehicle constitutes "use" of the vehicle. Is the majority opinion to be taken to this extreme end? If so, does leaning one's body against a vehicle also constitute "use" of the vehicle? Does standing some distance from a vehicle in order to photograph it constitute "use" of the vehicle? Does parking a vehicle in such a way that a strong glare from the sun reflects off of the vehicle's windshield constitute "use" of the vehicle? Under any of these circumstances, to follow the majority's reasoning, there could be "use" of the vehicle covered under the insurance policy if such circumstances are involved in producing an accident by, *e.g.,* creating a physical or optical obstruction to the driver of a passing second vehicle who is injured from some impact resulting from the obstruction. Should the majority opinion be followed to its logical extreme? If not, there is no assistance in drawing a reasonable line.

ensue).[3] In addition, this uncertainty, and the unpredictable damage awards from the courts that accompany it, will encourage automobile insurers to withdraw from the Wisconsin market, as they have from other states. *See generally, Id.* and E. Berg, *Insurance Giants No Longer Ask To Be All Things to All People,* N.Y. Times, Feb. 7, 1991, at 1 col. 1 (faced with heavy losses, many automobile insurers across the country have retreated from the marketplace).[4]

In a nutshell, the impact of the majority decision is to push the situation in Wisconsin in the direction of those states, such as California and New Jersey, where skyrocketing automobile insurance premiums have led to veritable insurance crises. *See generally,* J. Gold, *Last Tango in Trenton,* Financial World, Sept. 4, 1990 (LEXIS, Nexis library, current file) (skyrocketing automobile insurance premiums accompanied by possibility of insurers being in effect forced out of the market). By all appearances, such states will be sorting out their insurance crises for years to come. The vast majority of the citizenry of those states lose out.

In conclusion, the injury was not "*caused* by an accident *arising out of* the operation, maintenance or *use* of an *UNDERINSURED MOTOR VEHICLE*" as was required for coverage. (Emphasis added.) Moreover, coverage is not warranted on policy grounds. It was therefore incorrect for the majority to affirm the judg-

---

[3]In the case of uncertainty in the courts, the fair and equal administration of justice will be placed into jeopardy.

[4]If uncertainty in the meaning of the term "arising out of the use" continues to broaden, the meaning will become all inclusive. While society's insurance mechanisms can provide a valuable service under certain circumstances, they do not efficiently serve as a comprehensive social welfare system.

ment of the circuit court. I would reverse the decision of the circuit court. I therefore dissent.