MEIERHENRY, Justice.
[¶ 1.] This case involves a question of automobile insurance coverage for injuries sustained when a gun discharged while deer hunters were waiting to be transported to the fields. The circuit court found that the automobile liability policy covered the gunshot injuries.
[¶ 2.] Milbank Insurance Co. (Milbank) issued the automobile liability policy in question to Peterson Farms. Brad, Lenny and Danny Peterson were general partners in Peterson Farms.[1] In addition to *530 the Milbank automobile liability policy, Peterson Farms had an umbrella liability policy from North Star Mutual Ins. Co. (North Star). The circuit court found coverage under Milbank’s personal automobile liability policy. Milbank appeals. The court found no coverage under North Star’s umbrella policy because of exclusions specified in the policy.[2] The ruling as to North Star’s coverage has not been appealed.
[¶ 3.] In a trial to the court, the parties stipulated to most of the relevant facts. The day before the accident, Brad Peterson had been deer hunting with his sons Jeb and Shane. Eleven-year-old Jeb was using his father’s Winchester Model 94, .30-.30 lever action rifle to hunt varmints such as coyote or fox. While the hunting party was loading the rifles into the pickup at the conclusion of the hunt, a friend drove up and assisted young Jeb with loading the rifle into the vehicle. The friend ejected the round out of the chamber and opened the lever. The open lever made the rifle safe from discharge; however, its magazine still held ammunition. The friend placed the rifle into the back seat of the Peterson’s vehicle. He propped it near the middle of the backseat of the pickup with the barrel end on the floor and the butt leaning against the back of the seat. The hunting party then returned to Brad’s home driving through fields and over country roads. The rifle remained in the vehicle.
[¶ 4.] The next morning, Brad, Shane and Lenny’s fourteen-year-old son, Mitch again went deer hunting. While hunting, they walked through a slough and got their clothing wet. They removed and threw the wet hunting clothes in the pickup’s backseat on top of the rifle. The hunting party then returned to Brad’s home. Later that afternoon, Brad, Shane, Mitch and Jeb prepared to go hunting again. They got into the pickup: Brad and Shane in the front seat, Mitch and Jeb in the backseat. The rifle was still in the backseat situated between Jeb and Mitch. Jeb noticed that the wet hunting clothes were lying on the rifle and that the barrel had moved sideways and was unsafely pointed at Mitch’s leg. Jeb grasped the rifle in an attempt to reposition it away from Mitch’s leg. As he moved the rifle, it discharged and struck Mitch’s left ankle and grazed his right ankle.
[¶ 5.] The pickup engine was on and idling but the pickup was not moving at the time of the accident. The hunting party assumed that the vehicle’s movement over the two days had jostled the rifle causing the lever to close and that their wet hunting clothing on top of the gun had caught and pulled the trigger. There was no evidence that anyone had handled the gun since its placement in the pickup the day before.
[¶ 6.] Milbank brought a declaratory judgment action asking the circuit court to determine whether its automobile liability policy with Peterson Farms covered Mitch’s bodily injuries arising from this hunting accident. The dispute centers on the language in Milbank’s insurance policy defining coverage. The terms of the policy provide that “[Milbank] will pay damages for ‘bodily injuries’ or ‘property damage’ for which any insured becomes legally responsible because of an auto accident....” The policy further defines an “insured” as “you or any family member *531 for the ownership, maintenance or use of any automobile or trailer.”
[¶ 7.] The circuit court determined that Milbank was liable under the terms of the insurance policy. The court reached that conclusion by finding ambiguity in the term “auto accident,” in part because it was undefined in the policy. The court then applied the rules of construction for insurance contracts and interpreted the ambiguous term in the insured’s favor. Milbank argues that the circuit court erroneously found that the term, “auto accident,” was ambiguous solely because it was undefined in the policy. Milbank claims that the plain meaning of the policy’s term “auto accident” does not cover the accidental shooting. Milbank raises the following issue on appeal:
ISSUE
Whether the circuit court erred in holding that the shooting incident of November 24, 2001, was the result of an “auto accident” as that term is used in the Milbank insurance policy.
[¶ 8.] Our standard of review is de novo. We review a declaratory judgment under SDCL 21-24-13 “as we would any other judgment or order.” Gloe v. Union Ins. Co., 2005 SD 30, ¶7, 694 N.W.2d 252, 256. “When interpreting insurance contracts, we have uniformly held them reviewable as a matter of law under the de novo standard.” Opperman v. Heritage Mut. Ins. Co., 1997 SD 85, ¶ 3, 566 N.W.2d 487, 489 (citing De Smet Ins. Co. v. Gibson, 1996 SD 102, ¶ 5, 552 N.W.2d 98, 99) (other citations omitted).
[¶ 9.] The circuit court determined that since the Milbank policy did not define the term “auto accident,” the term was ambiguous and construed the term broadly in favor of the insured to find coverage. Milbank argues that the absence of a definition in the policy does not render the term ambiguous, and that the plain meaning of the term excludes coverage. Generally, we agree that the mere absence of a definition does not alone create ambiguity.
[¶ 10.] Ambiguity is created when the language in an insurance contract “is fairly susceptible to two constructions.” Nat’l Sun Indus., Inc. v. South Dakota Farm Bureau Ins. Co., 1999 SD 63, ¶ 18, 596 N.W.2d 45, 48 (citing Econ. Aero Club v. Avemco Ins. Co., 540 N.W.2d 644, 645 (S.D.1995) (citations omitted)). Ambiguity is “determined with reference to the policy as a whole and the plain meaning and effect of its words.” Id. By the terms of the policy, Milbank agreed to “pay damages for ‘bodily injuries’ or ‘property damage’ for which any insured becomes legally responsible because of an auto accident.... ” Although the parties disagree on the meaning of the terms, their meaning can be determined without resorting to an ambiguity analysis.
[¶ 11.] Milbank argues that the accidental discharge of the firearm in the backseat of the vehicle cannot be considered an “auto accident” as that term is defined under any common sense analysis. Milbank views the situation as one where an accident took place in an automobile and did not constitute an automobile accident. Milbank claims that the auto was merely the site of the occurrence and that there was no causal connection between the vehicle’s use and the injury-producing event.
[¶ 12.] Nevertheless, Milbank does not dispute that the policy covers accidents arising out of the “ownership, maintenance and use” of the vehicle. Milbank conceded during oral arguments that the statutory language covering “damages arising out of the ownership, maintenance, or use of the *532 vehicle,” must be considered when interpreting the insurance policy and that the language was, in effect, part of the policy. SDCL 32-35-70. Additionally, the policy uses these terms in its definition of insured. The Milbank policy defines “insured” as “you or any family member for the ownership, maintenance or use” of a vehicle. The policy also provides that “[w]hen this policy is certified as future proof of financial responsibility, this policy shall comply with the law to the extent required.” South Dakota law of financial responsibility requires insurance “against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of the vehicle or vehicles....” SDCL 32-35-70. Thus, a fair interpretation of the term “auto accident” would be an accident arising out of the “ownership, maintenance and use” of the automobile.
[¶ 13.] In Lyndoe v. American Standard Ins. Co., we analyzed insurance coverage of an accidental shooting in an automobile. 90 S.D. 644, 245 N.W.2d 273 (1976). In that case, Loren Lyndoe was riding through downtown Custer in a truck driven by his brother, James. Lyndoes pulled their vehicle over to the side of the road to talk to an acquaintance in another vehicle. Id. at 645, 245 N.W.2d at 273-74. While the vehicles were parked side by side, the acquaintance attempted to hand a .38 caliber pistol through his driver’s side window to Loren. Loren reached for the gun through his window. Before Loren touched the gun, it discharged and struck Loren in the mouth.
[¶ 14.] The policy language in Lyndoe provided as follows:
The company shall pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:
Coverage A — bodily injury caused by accident and arising out of the ownership, maintenance or use of the automobile.
‘(U)se’ of the automobile includes loading and unloading.
Id. at 647, 245 N.W.2d at 275.
[¶ 15.] Although much of the analysis in Lyndoe centered on whether passing the gun into the window constituted “loading or unloading” the vehicle, the basic question was whether the accident arose out of the “use” of the vehicle. Id. We said, “[s]ome causal connection between the ‘use’ of the vehicle ... and the accident must exist.” Id. (citations omitted). We also adopted a broad view of the ‘use’ clause in automobile coverage policies. Id. at 650, 245 N.W.2d at 276. We noted as follows:
Some of the cases [from other jurisdictions] involved efforts by a plaintiff to include his injuries within an automobile policy providing coverage under a ‘use’ clause, while others involved an effort by an insurer to exclude injuries from a homeowner’s policy because of a clause excluding automobile ‘use.’ In the latter policy the ‘use’ clause is given a narrow interpretation, while in the former, courts have adopted a broader interpretation. Therefore the broader view of the ‘use’ clause must be adopted in this case.
Id. at 649-50, 245 N.W.2d at 276 (emphasis added).
[¶ 16.] Even under the broader view, we determined that the vehicle in Lyndoe was the mere situs of the accident and the injury did not arise from the ‘use’ of the vehicle. Id. We analyzed it as follows:
Here the parties were within the City of Custer and not on a hunting expedition. They were merely discussing past and possible future hunting. The pistol was not to be delivered for the purpose of *533 hunting nor for any use other than an examination by plaintiff followed by a return to Stender. It has been held that under a “loading and unloading” clause, the efficient and predominating cause of the accident must arise from the “use” of the vehicle, (citations omitted). Sten-der’s actions were a continuation of the conversation between the parties and could well have taken place elsewhere except for the temporary storage of the pistol in the vehicle. His independent act of reaching out the window of the vehicle was the event which discharged the pistol. Only his hand and arm extended outside the vehicle. Plaintiff admitted that he could have reached the pistol from his vehicle which was approximately two feet away. The vehicle was merely the [sjitus from which Sten-der reached in attempting to deliver the pistol to plaintiff. We find this case more analogous to those cases where a gun was passed or moved within a vehicle than to those cases where a person stepped from his vehicle and attempted to remove a gun. We conclude that the policy’s provisions cannot be interpreted so broadly as to allow coverage here.

Id.

[¶ 17.] Milbank argues that Lyndoe supports its analysis and the absence of coverage because Lyndoe distinguishes between cases where firearms discharge while loading and unloading them from vehicles and cases where firearms discharge while being handled inside the automobile. Generally, cases from other jurisdictions that concern coverage of hunting accidents fall into categories. The Supreme Court of New Mexico lists the categories as follows:
1) accidents in which the actual movement of the vehicle caused the firing of the gun, as in transport; 2) accidents in which the discharged gun was being removed from or placed in a gun rack in the vehicle; 3) accidents in which the gun was being loaded into or unloaded from the vehicle; 4) accidents arising from use of the vehicle as a gun rest; and 5) accidents in which the vehicle is described as a “mere situs” for the accident, such as when children play with guns in a standing vehicle.
Sanchez v. Herrera, 109 N.M. 155, 783 P.2d 465, 467 (1989) (citation omitted). See also Cameron Mut Ins. Co. v. Ward, 599 S.W.2d 13, 15-16 (Mo.Ct.App.1980) (the court analyzed and categorized cases from several jurisdictions).
[¶ 18.] Milbank urges us to adopt the nexus test set forth by the South Carolina Supreme Court in Peagler v. USAA Ins. Co., 368 S.C. 153, 628 S.E.2d 475 (2006). The Peagler court used a three-part test previously adopted in State Farm Fire & Cas. Co. v. Aytes, 332 S.C. 30, 503 S.E.2d 744 (1998) to determine whether an injury arose from the “ownership, maintenance, or use” of a vehicle. Peagler, 628 S.E.2d at 477. The court explained the test as follows: “The party seeking coverage must show (1) a causal connection exists between the vehicle and the injury, (2) no act of independent significance breaks the causal link between the vehicle and the injury, and (3) the vehicle was being used for transportation purposes at the time of the injury.” Id. at 478 (citing Aytes, 503 S.E.2d at 745). The Peagler court specifically rejected precedent of other courts that find coverage when accidents occur during the loading and unloading of a vehicle. 628 S.E.2d at 480. The court narrowly limited coverage to instances where the plaintiff could demonstrate that the vehicle “was an active accessory to the injury.” Id. at 481.
[¶ 19.] The three-part test followed in Peagler is unique to South Carolina law dating back to 1975. See Home Ins. Co. v. *534 Towe, 314 S.C. 105, 441 S.E.2d 825, 827 (1994); see also Chapman v. Allstate Ins. Co., 263 S.C. 565, 211 S.E.2d 876 (1975). Most jurisdictions do not use such a restrictive test. We find this restrictive and narrow approach not in sync with Lyndoe, where we clearly adopted a broad view when applying a “use” clause in an automobile liability policy. Nevertheless, even with a broad interpretation, a plaintiff still has to show some causal connection between the injury and the vehicle.
[¶ 20.] Other courts have recognized a causal connection and found coverage when a gun discharges in a vehicle in conjunction with a hunting expedition. We referred to this causal connection by implication in Lyndoe. Our language in Lyn-doe implied that if the parties had been on a hunting expedition, our analysis would have been different. We said:
Here the parties were within the City of Custer and not on a hunting expedition. They were merely discussing past and possible future hunting. The pistol was not to be delivered for the purpose of hunting nor for any use other than an examination by plaintiff followed by a return to Stender.
Lyndoe, 90 S.D. at 650, 245 N.W.2d at 276 (emphasis added).
[¶ 21.] Mitch Peterson’s injury un-disputedly occurred during the “use” of the vehicle on a hunting trip. Whether the vehicle was more than “mere situs,” however, requires additional analysis. For purposes of coverage under the policy, there must be a causal connection between the accident that injured Mitch Peterson and the use of the pickup truck. Other jurisdictions have required “for coverage to apply, ‘[t]he injury must also have a causal connection to the inherent use of the vehicle.’ ” Kemp v. Feltz, 174 Wis.2d 406, 497 N.W.2d 751, 755 (Ct.App.1993) (holding that use of a truck as a “mobile hunting vehicle is consistent with the truck’s inherent use” for transportation of hunters); see, e.g., Sanchez, 783 P.2d at 467 (concluding “that emptying a gun within the cab of a pickup truck is foreseeably incident to use of that vehicle for hunting”); Allstate Ins. Co. v. Powers, 190 Ariz. 432, 949 P.2d 521, 524 (Ct.App.1998); Taliaferro v. Progressive Specialty Ins. Co., 821 So.2d 976, 978 (Ala.2001). We find this causal connection analysis more persuasive than the narrow three-part test used in Peagler, 368 S.C. 153, 628 S.E.2d 475.
[¶ 22.] The Kansas Supreme Court, in a strikingly similar hunting accident ease, applied a causal connection analysis to find coverage. Garrison v. State Farm Mut. Auto. Ins. Co., 258 Kan. 547, 907 P.2d 891 (1995). In Garrison, two men were hunting doves. They stopped the car for one of the hunters to get out. A gun stowed between the front seats of the vehicle discharged while one of the men was getting out of the car. No one knew why the gun discharged. The discharge struck the other passenger in the leg causing serious injury. Id. at 893. The terms of the liability policy were similar to Milbank’s policy. The policy covered damages “which an insured becomes legally liable to pay because of ... bodily injury to others ... caused by accident resulting from the ownership, maintenance or use of your car.” Id. The policy also “promise[d] to pay damages for bodily injury ... for which the law holds you responsible because of a car accident. ...”[3] Id. at 894. *535 The court explained the causal connection as follows:
[F]or insurance coverage to exist for accidental bodily injury, there is no requirement that the vehicle be either the proximate cause of the injury or physically contribute to the discharge of the gun. Coverage exists where the minimal causal connection between the use of the vehicle and injury is provided by the foreseeable and reasonable use of the vehicle for hunting.
Id. at 895.
[¶23.] The court found that the car was more than the mere situs of the injury, and endorsed the statement that “Kansas follows the majority rule that there must be some causal connection between the use of the insured vehicle and the injury.” Id. at 895 (citation omitted). The court held that “under the facts of this case, the injury sustained by Garrison, the driver, when a shotgun inside the car accidentally discharged as it was removed from the car, was a natural and reasonable incident arising out of the use of the car for hunting.” Id. at 896.
[¶ 24.] Other courts have used a similar inquiry. See Thompson v. State Farm Mut. Auto. Ins. Co., 161 Wis.2d 450, 468 N.W.2d 432, 435 (1991). The Wisconsin Supreme Court found automobile liability insurance coverage for a hunting accident because using a truck “for a hunting trip is reasonably consistent with the inherent use of the truck.” Id. In Allstate Ins. Co. v. Truck Ins. Exchange, the Wisconsin Supreme Court considered whether an accidental shooting on a hunting trip in a van was covered by the “use” provision in the insured’s automobile liability policy. 63 Wis.2d 148, 216 N.W.2d 205 (1974). In that case, the passenger accidentally shot the driver while unloading the rifle from the vehicle for the purposes of shooting an elk. The Wisconsin Supreme Court held that the use of a van for carrying hunters and guns when the van was outfitted for hunting “was reasonable and could be expected.” Id. at 210. The court found coverage “[i]f it can reasonably be expected that this van would be used to go on such a hunting outing, the necessary incidentals for such a hunting trip will be transported in the van, i.e., rifles, ammunition, equipment and supplies.” Id. The court used the following test to determine whether the “use” of the vehicle was the cause of the bodily injuries:
In determining whether the negligent act that caused bodily injury arose out of the ‘use’ of a motor vehicle within the coverage of a motor vehicle liability policy, the court must consider whether it was a natural and reasonable incident or consequence of the use of the vehicle for the purposes shown by the declarations, though not foreseen or expected. Thus, it has been held that one who entered an automobile in order to move it a short distance so as to enable him to park his own automobile was ‘using’ such when, because of defective brakes, the car rolled into a third car and caused injuries thereto. However, it has been held that an injury need not be the direct and proximate result, in a strict legal sense, of the use of an automobile to come within coverage of a policy indemnifying against liability for damages caused by accident and arising out of the ownership, maintenance or use of the automobile. This principle has been applied in cases where the injuries for which recovery was sought did not result from the movement of the vehicle.
Id. at 211 (citation omitted). The court concluded that this accidental shooting fell within the “use” provision of the automobile liability policy. Id. The gun’s accidental discharge was a natural and reasonable consequence of transporting guns on a *536 hunting trip. Id. The New Mexico Supreme Court posed the inquiry as follows: “the proper inquiry in hunting accidents involving automobiles is whether the use made of the vehicle at the time of the accident logically flows from and is consistent with the foreseeable uses of that vehicle.” Sanchez, 788 P.2d at 467.
[¶ 25.] In the circuit court’s memorandum decision it stated: “Having reviewed [the pertinent cases] it is my conclusion that there is coverage for this type of accident under the Milbank policy because it clearly happened on a hunting expedition.” Furthermore, the circuit court concluded: “that the vehicle was not the mere situs of the accident, but that the loading of the rifle into the vehicle, its location in the vehicle and its movement were part of the use of the vehicle in the hunting expedition.” We agree with the circuit court’s logical conclusion that the vehicle was being used in a hunting expedition. The parties stipulated facts provided that at the time of the shooting “[t]he four occupants were all seated in the pickup. They were waiting for Trent Peterson to enter the pickup so they could leave to go hunting.” (Emphasis added). The stipulated facts also indicated that the afternoon hunt was a continuation of the morning hunting expedition. Temporarily stopping the vehicle for a brief snack break did not eliminate the purpose for which the gun was loaded and present in the vehicle. At the time of the accident, the hunters were preparing to continue the hunting expedition: the hunters had entered the vehicle, the guns were still in the vehicle, the vehicle was running and the party intended to continue the morning hunt as soon as the final passenger got into the pickup.
[¶ 26.] Clearly, an inherent use of a pickup truck is for transportation, which may involve driving through fields and over country roads. Here, the vehicle was being used to transport deer hunters to the field along with their equipment, clothing and guns. Transporting hunters and guns is a foreseeable and inherent use of a pickup truck in this State. Thus, it logically follows that when a pickup is being used in a hunting expedition where guns are being transported, the accidental discharge of the firearm can be said to be causally connected to the vehicle’s use. The vehicle need not be the cause of the discharge only that its use is causally connected.
[¶ 27.] The circuit court found that the Milbank policy covered the hunting accident because the accident occurred in connection with the use of a vehicle in conjunction with a hunting expedition, and because the vehicle was more than the mere situs of the accident.[4] Based on the undisputed facts and the language of the policy, we affirm.
[¶ 28.] GILBERTSON, Chief Justice, and SABERS, Justice, concur.
[¶ 29.] KONENKAMP and ZINTER, Justices, dissent.

. Brad, Lenny and Danny Peterson were partners in the Peterson Farms Partnership. Brad Peterson and his immediate family and Lenny Peterson and his immediate family lived in separate households approximately 1.5 miles from each other.

. The circuit court found that the North Star policy provided no coverage for the injuries because it contained language that excluded coverage for bodily injuries resulting from the ownership, operation, maintenance, use, and loading or unloading of a vehicle. Peterson Farms did not appeal the circuit court's ruling.

. The policy defined "car accident” as "an unexpected and unintended event that causes injury or property damage and arises out of the ownership maintenance, or use of a car or other motor vehicle.” Garrison, 907 P.2d at 894. "The policy provisions did not expressly define 'use' to include loading or unloading of a vehicle.” Id. at 894.

. The circuit court also found that the vehicle was the "efficient and predominating cause” of the accident. In Cain v. Fortis Ins. Co., we held this doctrine did not apply to health insurance policies. 2005 SD 39, 694 N.W.2d 709. We stated, "[t]he doctrine of efficient proximate cause has been utilized in cases involving property and casualty insurance policies.” Id. ¶ 25, 694 N.W.2d at 714. It is applied "where two separate or distinct perils could have occurred independently of the other and caused damage.” Id. In dicta in Lyn-doe we cited to this standard. 245 N.W.2d at 276. We decline to discuss whether the "efficient and predominating cause” doctrine applies in this context because it is not properly before the Court.